## THE SUSANNA E. WALDIE.

## THE PETER C. GALLAGHER.

## THE WILLIAMS NO. 52.
### Nos. A–15601, A–16010.

District Court, E. D. New York.

Jan. 29, 1941.

Purdy & Lamb, of New York City (John E. Purdy, of New York City, of counsel), for libelant Susanna E. Waldie.

Burlingham, Veeder, Clark & Hupper, of New York City (Edward L. Smith, of New York City, of counsel), for libelant Red Star Towing & Transportation Co.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for claimant Gallagher.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for claimant Williams.

BYERS, District Judge.

These causes were tried together, although not consolidated. They involve damage to two scows laden with sand, which were in tow of the steamtug Peter C. Gallagher, on October 2, 1938, departure having been had from Port Jefferson, Long Island, for New York, at about 4:30 p. m.

The principal dispute concerns the make-up of the tow; also it is asserted, but not shown, that after the tow broke up, there was a failure on the part of the Gallagher to properly care for these two scows after they came adrift.

The libelants' pleadings are consistent with a reluctance to select the precise theory of liability upon which to seek recovery.

In the earlier cause, a libel was filed on March 2, 1939, by the owner of the second scow, Susanna E. Waldie, against the hawser scow Williams No. 52, charging the latter with fault in that her stern starboard and port bitts let go; i. e., broke off, in. that order, while the tow was about off Northport, and that she was unseaworthy and those in charge of her were incompetent and inattentive.

Eight months later, and on November 24, 1939, an amended libel was filed in which the tug Gallagher was also named, and as to her the faults alleged were: Improper make-up of tow in that the alignment of the scows disregarded diversity of freeboards; that the tow was too long;

that departure was had in the face of a storm and at a time when storms were to be expected; failure to timely seek a harbor of refuge; failure to render proper assistance after the tow broke adrift; and failure to turn back and render assistance when danger to the tow was or should have been apparent.

The said faults of the Williams No. 52 were realleged.

The Williams No. 52 was claimed February 2, 1940, and the answer of her claimant was filed February 10, 1940, asserting that, if any damage was sustained by the Waldie, it was due to the tug Gallagher's negligence.

The tug was claimed on January 20, 1940, and the answer of her owner was filed January 31, 1940.

In the second cause, the owner of the sixth scow in the tow, the Sands Point, filed a separate libel against the tug and the Williams No. 52 on August 20, 1940, and they were claimed and answers filed on September 23, and September 13, 1940.

This libel asserts the same faults, in somewhat different form, and additionally, that the tug "set out across Long Island Sound in the face of unfavorable weather conditions", although it must have been well known that no attempt at all was made to cross the Sound. Also that there was a failure to make a proper inspection of the towing bitts on the Williams No. 52.

The same faults as have been earlier stated were alleged against the latter barge.

Then the causes made their way to trial on December 4, 1940, and 260 pages of testimony were taken, with the result that the Williams No. 52 was dropped from both causes on motion to dismiss, which was not opposed, for lack of proof to hold her on any count.

The considerable volume of testimony was restricted to the question of the make-up of the tow almost entirely, and the little that had to do with the lack of assistance to the vessels in the tow, after the breaking of the bitts on the Williams No. 52, was entirely negative.

These litigations resulted from the break-up of a seven-barge tow on the night in question, off Eaton's Neck in Long Island Sound. Departure as stated was under favorable conditions of weather and tide. The several barges were closely held in tandem; that is, they were apart not more than from 1 foot to 3 or 4. As to each,

there were port and starboard hawsers leading to the barge ahead, the eye being on the following vessel, with one turn around the bitt of the barge ahead, except that on the hawser barge the captain said there was no turn of the hawsers from the second barge. There is no criticism of the hawsers as to size or strength. There were also cross-lines properly rigged, between the several barges; the latter were arranged in this order: Williams No. 52, the hawser barge; then the Waldie; North River No. 3; Williams No. 53; North River No. 4; Sands Point, and Arthur Mc-Cabe.

These cases concern damage to the second and sixth. The several dimensions need not be tabulated as they were fairly uniform as to all the vessels, varying from 117 feet to 112 feet in length, and from 36 to 34.3 feet in beam.

The hawser barge, Williams No. 52, was 114 feet by 35.7 feet, and her beam was exceeded only by that of the fourth (the Williams No. 53) which was 36 feet—a difference of 3/10 of a foot.

The inside depths of holds varied from 8.6 to 9.4 feet, except as to the third barge, in which that dimension was 11 feet, 7 inches. The first or hawser barge, the third and the fourth were loaded with gravel; the second, sixth, and seventh with sand, and the fifth with a split load of sand and gravel.

The wind was light southerly, and there were no whitecaps on the Sound. Rounding the breakwater, all the bargees, without orders from the tug, slackened hawsers, and the tug had out about 100 fathoms on a bridle, to the head barge.

Progress westerly continued without incident until about 10 p. m., when the wind freshened, and hauled around through the east and into the northeast, and the tide having changed, a choppy sea developed.

As to four of the barges other than the Williams No. 52, it appears from the testimony of their captains that they slackened hawsers further, about as soon as these conditions developed, although this may not be true as to the Waldie; her bargee says that his vessel was 10 or 12 feet astern of the Williams No. 52 at this time. The tug headed for Huntington harbor, and quieter waters, because of the conditions of wind and water which have been stated, and when she was west of Eaton's Neck, the barges were riding up and down in the chop, and the stern bitts

on the Williams No. 52 broke off in the order stated; this cast loose the six following vessels, as the tug at once observed.

The latter proceeded into Huntington harbor with the Williams No. 52; left her in quiet waters near a stake boat, and returned to pick up the other vessels. They had become separated as follows: The second and third came adrift from the other four, and later from each other; the group of four were taken in tow by the tug; then two of them parted from the other two on the way into the harbor, but were finally put into quiet waters; then the tug returned for the second barge, the Waldie, and could not put a line on her because she had gone on the beach in shallow water, but the captain was taken from her in a small boat from the tug.

It seems that the third barge dropped her anchor shortly after the break-up of the tow, and her captain was taken off by the tug, on the first trip back for the six barges. Presumably she was later taken in proper care.

The damage to the Waldie is to be accounted for from the foregoing recital. That to the Sands Point occurred after the tow broke up, and was occasioned by "going up and down and coming up against the North River No. 4 (the barge ahead), which had a bumper on her with irons on the end of it, and that is what done the chafing, after she chewed off our cross-lines and we couldn't hold her from going back and forth, because they was mostly stern to the wind".

The bargee of the Sands Point holds a master's license in sail, and chief mate of steam. He said that at this time the wind was blowing pretty fresh from the northeast, but it was not an unusual blow.

The Williams No. 52 had a 2-foot freeboard aft, while the Waldie had about 5 feet forward, and that difference of 3 feet provides the libelants with their only serious contention of fault on the part of the tug.

As to the following barges, the third had about a foot less freeboard than the Waldie and about 6 inches more than the fourth; the bargee of the latter said his freeboard was about 5 feet forward and about 3 feet aft. The Sands Point, the sixth vessel, had a 2-foot freeboard forward and aft, and nothing is shown in that respect, as to the seventh barge.

Since there was a difference of about 3 feet between the stern end of the hawser barge and the bow of the Waldie, it is apparent that the lead of the hawsers was downward, and as there was a space of from 10 to 12 feet between the vessels when the break-up occurred, the argument is, that this lead was so abrupt that the strain upon the towing bitts of the head barge was necessarily of vertical as well as horizontal constituency, and the failure to avoid that condition made out the negligence for which the tug must be held.

The argument might be sound enough as a matter of mechanics, but it is not buttressed by any testimony to the effect that the bitts broke when subjected to a partially vertical as well as horizontal strain.

The tow had proceeded across Smithtown Bay (roughly 20 miles) safely and without incident, which means that the strain upon the stern bitts of the Williams No. 52 during this portion of the trip was not excessive or unusual. Nor is there proof that the breaking off of the bitts occurred while the stern of the Williams No. 52 was down and the bow of the Waldie was up, in the choppy seas which have been described. It is consistent with the testimony that the first break happened when the adjacent ends of these vessels were in the contrary relation.

It is thought that, before the alleged fault can be rationally urged, it must be shown to have been a competent producing cause of the happening, not as a theory, but from evidence of the occurrence.

In the absence of such proof, the contention dwindles into an argument that the carrying away of the bitts may have happened because the second barge was 3 feet further out of the water than the first.

So far as the adequacy of the bitts as such is concerned, that question disappeared with the dismissal of the Williams No. 52 from the case; necessarily it follows that a failure on the part of the tug to inspect them, assuming such failure to have been demonstrated, is without significance, for had an inspection been made it could have resulted only in disclosing that the bitts were of approved design, material and construction.

There has been no proof that the tow was too long, for the records of the owner show that experience for two years on this run was to the contrary.

As to departure in the face of a storm, or unfavorable weather conditions, the proof is equally against the libelants. It

has been shown that Huntington harbor was the first available haven, and that the tow was headed for it, as soon as the conditions of wind and sea dictated such a course.

The proof is equally unsatisfactory, if present at all, that the tug omitted any duty to either libelant in seeking to tow these vessels into quiet waters once the break-up had occurred.

So it is, that the one issue of any importance is the make-up of the tow as it has been described.

That the tug was responsible therefor is too clear for discussion. The Margaret Irving, 2 Cir., 47 F.2d 230.

This of course is true, however the make-up was contrived; whether by the mate of the tug, or by other agencies functioning prior to the arrival of the tug in the harbor of Port Jefferson.

If the fact be assumed, for argument, that the breaking of the bitts is to be accounted for only by the disparity of the respective freeboards of the first and second barges, does it follow that such make-up constituted negligence?

The evidence does not yield a clear and convincing answer to this question, for the opinions expressed by the various witnesses who were called on that subject were at variance. The most that can be said is that some navigators prefer the highest barge first; some prefer the widest, and some consider a difference of only 3 feet in freeboard to be unimportant.

Not much importance can be attached to the claimant's assertion that the Williams No. 52 was selected as the hawser vessel rather than the Waldie because the former carried gravel which does not wash overside as easily as sand, with which the second barge was laden, for as to such there would be a possible loss of cargo, and consequent listing in even moderate seas. The fourth barge, Williams No. 53, carried gravel and she was higher out of the water, fore and aft, than the Williams No. 52. The North River No. 4 was a larger vessel than either, and carried a split cargo, and seemingly either could have been the hawser barge. And so the issue recurs to the narrow one which has been stated.

The Waldie relies upon Waterland Operating Co., Inc., v. New York Trap Rock Corporation, 1925 A.M.C. 1497. There a center barge of three, in the second tier of a harbor tow, was overridden by one directly astern in the third tier, while the towing hawser was slack in the water because the tug slowed down because of adjacent navigation. Failure to keep the towing lines taut, and the make-up of the tow imposed liability on the tug. The second reason arose from the fact that the overriding barge was higher out of the water and had a raking bow. Obviously the case is not a precedent here.

Mott Haven Lighterage Co. v. Steamtugs Bern and Ashbourne, D.C., 1931 A.M.C. 961, 51 F.2d 501, 503. This is a similar case, in which the offending barge was directly astern of the one that was damaged; it was more heavily laden; had a raked bow, and was on 3 to 5-foot lines. The tug was held for negligent make-up "by placing the Liberty [the pounding barge], a boat with a raked bow and much higher freeboard, astern of the Redmar, on such short lines that the Liberty was permitted to and did ride up on and pound the stern of the Redmar * * *."

If in this cause the Waldie had ridden up and pounded the stern of the Williams No. 52, the cited case would be authority for holding the tug Gallagher at fault for the damage thereby sustained. I hope it is clear that there is no such issue before the court.

Edward J. Reilly v. Steamtug Bear, 1928 A.M.C. 1519. Here the court pointedly decided that it was not negligence on the part of a tug to place a higher boat in a tow, astern of a lower one, but that such condition should have controlled a turn that resulted in damage, where short hawsers were used.

Robert Rogers v. Cornell Steamboat Co., 1928 A.M.C. 1113. Here a tow was being broken up, and again a higher vessel with a raking bow was astern of a lower vessel, and apparently they were in such proximity that swell damage ensued during the said process; the court stated that the proximate cause of the injury was the relative positions of the vessels but: "I do not think that that, of itself, imputes negligence * * *".

The Ganoga, D.C., 130 F. 399. This case is so remote factually from the instant cause that its citation is not understood. The same remark applies to The Niagara, D.C., 20 F. 152, and two other cases appearing in the Waldie brief.

It results that neither the testimony in the cases, nor the authorities cited, sustain the libelants' assertion that the tug Gal-

88

lagher was negligent in the make-up of the tow; nor does it appear that she failed in her duty to either the Waldie or the Sands Point after the break-up of the tow.

Decree is ordered, dismissing the libels for failure of proof, with costs, to be settled on notice. Findings in accordance with the foregoing may be settled at the same time, if counsel are so advised.